AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.    '25   MJ226 |
| Meta Platforms Inc. | ) |
| 1 Meta Way, Menlo Park, CA 94025 | ) |
| Instagram Account: "sammy_xoxo111" | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transportation Of Illegal Aliens (a)(1)(A)(ii) |
| Title 18, United States Code,§ 111 | Assault On A Federal Officer |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Georgina Hayslip, incorporated herein by reference.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Georgina Hayslip*
*Applicant's  signature*

Georgina Hayslip, Border Patrol Agent, US Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:    01/16/2025

*Judge's signature*

City and state:   San Diego, California                     Hon. Mitchell D. Dembin, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched:

Meta Platforms, Inc. ("Meta") is a social networking, electronic communication, and remote computing service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at 1 Meta Way, Menlo Park, CA 94025.

This warrant applies to information associated with the **Target Account**, Instagram account "sammy_xoxo111" (active on, but not limited to, June 11, 2024), that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., in Menlo Park, California.

## ATTACHMENT B
### Particular Things to be Seized

### I.    Information to be disclosed by Meta

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms Inc. ("Meta"), including any messages, records, files, logs, or information that have been deleted but are still available to Meta Platforms Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta Platforms Inc. is required to disclose the following information for each account or identifier listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook/Instagram passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook/Instagram activities;

(c)    All photos and videos uploaded by that account and all photos and videos uploaded by any user that have that user tagged in them;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook/Instagram user identification numbers; groups and networks of which the user is a member, including the groups' Facebook/Instagram group identification numbers; future and past event postings; rejected

"Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook/Instagram applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook/Instagram posts and all non- Facebook/Instagram webpages and content that the user has "liked";

(i) All information about the Facebook/Instagram pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook/Instagram searches performed by the account;

(l) All information about the user's access and use of Facebook/Instagram Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook/Instagram posts and activities, and all records showing which Facebook/Instagram users have been blocked by the account;

(p)    All records pertaining to communications between Facebook/Instagram and any person regarding the user or the user's Facebook/Instagram account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

The search of the electronic records supplied by Meta Platforms Inc. pursuant to this warrant will be conducted as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant. The search of the data will be limited in time from April 1, 2024 to June 12, 2024 and be further limited to:

(a)    Records tending to show alien trafficking, including communications referring to alien smuggling arrangements, smuggling routes, payment, and methods of smuggling, delivery locations, communications referring to the acquisition of vehicles and or individuals to drive those vehicles;

(b)    Records that provide context to any other communication reflecting the criminal activity described in this warrant including any electronic mail or other communication sent or received in temporal proximity to any relevant electronic mail or other communication and any electronic mail or other communication that identifies any users of the subject account;

(c)    Records identifying the user(s) of the **Target Account**;

(d)    Records indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of

account access, use, and events relating to the crime under
investigation and to the Instagram account owner;

(e)    Records identifying the transmission of currency, funds, or other
value that substitutes currency to another location or person by any
means. "Any means" includes, but not limited to, through a financial
agency or institution; an electronic funds transfer network; an
informal value transfer system; or any person engaged in the transfer
of funds, operating as an unlicensed Money Service Business.

(f)    The identity of the person(s) who communicated with the account user
about matters relating to violations of 8 U.S.C. § 1324, including
records that help reveal their whereabouts;

Which are evidence of violations of 8 U.S.C. § 1324 (alien smuggling and
conspiracy to smuggle aliens).

# AFFIDAVIT

I, Georgina Hayslip, a Border Patrol Agent with United States Homeland Security, Customs and Border Protection, United States Border Patrol, being duly sworn, hereby state as follows:

## INTRODUCTION

1.    I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by agents of the United States Border Patrol ("USBP") to search the following Instagram account:

"sammy_xoxo111" (hereinafter referred to as the "**Target Account**"),
further described in Attachment A, and that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way, Menlo Park, California 94025. The **Target Account** is believed to be owned and used by Samantha Alize DELGADO Perez ("DELGADO").

2.    This affidavit is made in support of an application for a search warrant under Title 18, U.S.C., §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the United States copies of the information (including the content of communications), pertaining to the subscriber or customer associated with the **Target Account** as described in Attachment A, and to seize evidence of crimes as further described in Attachment B, specifically, violations of: for items described in Attachment B, that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, specifically, violations of: Title 8 , United States Code 1324 (a)(1)(A)(ii), transport of an alien who is unlawfully present in the United States, and Title 18 United States Code, Section 111, assault on a federal officer .

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient

probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## EXPERIENCE AND TRAINING

4.     I am a United States Border Patrol ("USBP") agent with the Department of Homeland Security, Customs and Border Protection. I have been employed as a full-time, sworn federal agent with the USBP since January 16, 2001, having graduated from the USBP Basic Border Patrol Training Academy located in Charleston, South Carolina in May of 2001. The Academy curriculum covers specialized training in the Immigration and Naturalization Act (INA), criminal law, and statutory authority, as well as cross-training in Title 21 of the United States Code (Controlled Substance Act (CSA) violations) and Title 19 of the United States Code (customs law violations).  I have been trained in investigating various violations of federal law, including alien smuggling, narcotics smuggling, weapons smuggling, and bulk currency smuggling.  I have also worked with and learned from other agents and criminal investigators with extensive experience in these investigations.

5.     As a Border Patrol Agent (BPA), I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedures, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As an agent with the Border Patrol, I investigate violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324, and other related offenses.

6.     During my career, I have participated in the investigation of a number of cases involving the smuggling of undocumented aliens from Mexico into the United States and the transportation of undocumented aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and indictments of persons for alien smuggling, including drivers, passengers, and foot guides.

6.     I am currently assigned to the San Diego Sector Anti-Smuggling Unit (ASU). ASU is tasked with investigating, arresting, and prosecuting alien and drug smuggling

organizations that utilize the Southern and Central Districts of California as an operational corridor. ASU is also tasked with investigating narcotic smuggling, bulk cash smuggling, and assaults on federal officers, theft and damage of government equipment, escapes from federal custody, and a variety of other federal and state offenses.

7.      During the course of my employment with USBP, I have arrested more than 250 individuals in connection with alien smuggling crimes. I have also participated in longer-term investigations including, but not limited to alien smuggling investigations, that have resulted in criminal prosecutions. Through these experiences, I have become familiar with the activities of those who coordinate smuggling events and the practices employed by the drivers/smugglers locally and abroad, including recruitment methods, transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement.

8.      Through my training and experience, I have gained a working knowledge of and insights into the workings of criminal organizations. I have become familiar with the operations of both large and small alien and/or drug smuggling organizations (ASOs/DTOs) operating within the United States and internationally. I have also gained extensive information as to the operation habits of persons who make their living as alien and narcotics smugglers. I have become familiar with the behavior, speech, routes and methods of operations utilized by criminal organizations to avoid detection and apprehension by law enforcement officers.

9.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal

aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

10.    Based upon my training, experience and the facts as set forth in this Affidavit, there is probable cause to believe that evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) exists on the **Target Account**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## FACTS SUPPORTING PROBABLE CAUSE

11.    On June 11, 2024, at approximately 8:44 p.m., Border Patrol Agents assigned to the Brown Field Border Patrol Station conducted a traffic stop on a vehicle being operated by Samantha Alize DELGADO Perez. Agents approched the vehicle and questioned DELGADO. During the traffic stop, agents observed a subject, subsequently identified as E. Razo-Juarez, attempting to conceal himself in the rear floorboard area and instructed DELGADO to turn her vehicle off and remove the keys. DELGADO only turned off her vehicle. DELGADO became non- compliant to agents' commands and restarted her vehicle. DELGADO proceeded to drive away, fleeing with an agent, M. Munoz, partially trapped inside her vehicle. As DELGADO fled, she struck a border patrol vehicle that was parked nearby. As a result of that collision, the border patrol vehicle (that was unmanned at the time) struck a second agent who had been crouched next to that vehicle.

12.    DELGADO continued to drive with M. Munoz for 20 yards, until agents sucessfully deployed a Vehicle Immoboization Device ("VID") on DELGADO's vehicle.

The VID forced DELGADO to briefly stop her vehicle a second time, allowing the agent that had been partially trapped in her vehicle to free himself and get out. DELGADO took off again, driving for another 150 yards before crashing into a berm and stop sign where she fled on foot from her vehicle. DELGADO was subsequently placed under arrest for alien smuggling and the assualt of two federal agents. Agents determined that E. Razo-Juarez, who had been attempting to conceal himself in the rear floorboard of the vehicle, was an undocumented alien. DELGADO and the undocumented alien were transported to the Brown Field Border Patrol Station for processing.

13. At the station, DELGADO was advised of her Miranda Rights. DELGADO stated she understood her rights and was willing to answer questions without an attorney present. DELGADO identifed a purple Iphone 14 Pro Max as her property and subsequenly consented to the search of her ceullar phone ("DELGADO's phone"). DELGADO stated she made arrangements through an unknown contact via WhatsApp and Instagram to smuggle individuals from the United States/Mexico border to the Los Angeles, California area. DELGADO stated she is paid $2,000 per individual successfully smuggled. DELGADO stated that in the month of May or April, she successfully smuggled one individual via the same method and was paid $2,000. DELGADO stated she was paid in cash by a man wearing a ski-mask in a Burger King parking lot. DELGADO stated on June 11, 2024, she contacted the same unknown individual via Instagram and asked if "he" had any work. The unknown individual sent DELGADO a location and instructed DELGADO to drive to the provided location and pick up one individual. DELGADO stated she would receive the drop off location from the unknown individual, upon successfully picking up.

14. DELGADO stated she arrived at the location at approximately 8:00 p.m., pulled over onto the side of the road, and waited for approximately 20 minutes before an individual entered her car. DELGADO stated she believed the individual was "illegal." DELGADO stated she drove for approximately 20 minutes before noticing a "cop car's emergency lights." DELGADO stated she pulled over and the Agent approached her driver side window and instructed her to turn the vehicle off and step out. DELGADO stated she

turned off the vehicle and wanted to know why she was being stopped. DELGADO stated after the Agent opened her door, she entered "panic mode," started the car, and stepped on the gas. DELGADO stated the Agent had his arm around her neck and she could not see. DELGADO stated she felt a bump or nudge and then heard the Agent say "Ouch, my leg." DELGADO went on to state that she stopped the vehicle and began to run. DELGADO stated she ran for a short distance before falling and was subsequently arrested.

15.    On June 26, 2024,the Honorable Allison H. Goddard in the Southern District of California signed a search warrant for the search of DELGADO's phone (24MJ2439). During the search of DELGADO's phone, agents identifed the **Target Account** as belonging to DELGADO. As described above, during DELGADO's post Miranda statement, she admitted to using Instagram to communicate with the smuggling coordinator/recuiter for this smuggling event and previous suggling events. Some Instagram messages from the **Target Account** that were recovered from DELGADO's phone during the search appear to corroborate DELGADO's statement.

16.    Specifically, on June 11, 2024, Instagram messages show communications between the **Target Account** and an individual with the Instagram account name "losdelamochila." Among other things, losdelamochila messaged the **Target Account** asking how much time she [DELGADO] had left, and the **Target Account** then sent losdelamochila an address in Jamul, California and asked, "Im going to the right place right." Losdelamochila subsequently messaged the **Target Account**, "delete these" and "stay on what's app." These messages began at 6:41pm and ended at 8:41pm. DELGADO was subsequently arrested at 8:44pm.

17. Based on my experience investigating alien smugglers, there is probable cause to believe that the **Target Account** was used to communicate with alien smuggling recruiters and discuss details of their criminal activity/participation related to alien smuggling.

## BACKGROUND CONCERNING INSTAGRAM[1]

18.    Instagram is a service owned by Meta Platforms, Inc., a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the **Target Account** listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

19.    Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

20.    Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

21.    Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/;    "Information for Law Enforcement," https://help.instagram.com/494561080557017;    and    "Help    Center," https://help.instagram.com.

22.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

23.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

24.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

25.    Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

26.    One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or

stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

27.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

28.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

29.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

30.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

31.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

32.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

33.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

34.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

35.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36.    For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including

usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

### ITEMS TO BE SEIZED

37.    As outlined above, investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that social media services, like Instagram, are often created and used to coordinate payments and meetings, and to conduct negotiations and other matters relating to criminal schemes, through social media communications, photos, audio files, and/or videos, all of which are available from Meta's servers as outlined above. Based on my training and experience, photos, audio files, and/or videos are often created and used in furtherance of criminal activity. Thus, in addition to stored communications, photos, audio files, and/or videos connected to the **Target Account** also may provide direct evidence of the offenses under investigation such as the timing, transportation method, and location of the alien smuggling event. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  For example, account activity may provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation, such as the owner's motive and intent to commit a crime (e.g., communications indicating a plan to commit a crime) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). Communications, photos, audio files, and/or videos that Meta can produce related to the **Target Account** also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation.

38.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled

the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, device information (i.e., the device used to access the Instagram account), and the data associated with the foregoing (such as geo-location, date, and time information related to access, communications, etc.)  may be evidence of who used or controlled the **Target Account** at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices—and thereby which user(s)—likely accessed the **Target Account**.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

39.   Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, the direct messages and stored data may reveal additional "CashApp", "Zelle", "ApplePay" and other online platforms that have been used in further of aforementioned criminal conduct.  In addition, emails, instant messages, direct messages, Internet activity, documents, contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

40.   Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

41.   Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta is not. It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant account and then to analyze the content of the account on the premises of Meta. The impact on Meta's business would be severe.

42.     Therefore, I request authority to seize the content from the **Target Account**, as described in Section II of Attachment B. In order to accomplish the objective of the search warrants with a minimum of interference with the business activities of Meta, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority is sought to allow Meta to make a digital copy of the contents described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

43.     Analyzing the data to be provided by Meta may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

44.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to the warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this Court.

45.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrants. Based on training and experience, investigators are aware that people engaged in

smuggling illegal aliens, as the user of **Target Account** appears to be, often use social media services, like Instagram, to coordinate pickup time and locations, and to conduct negotiations and other matters relating to criminal schemes. As such, this application seeks all materials from Meta for the **Target Account** as described in Section II of Attachment B for the time period from April 1, 2024, and up to and including June 12, 2024.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

46.    As noted above, the United States has previously obtained evidence from Defendant's phone of her use of the **Target Account** from the download of Defendant's phone. However, the download of Defendant's phone was not able to recover all Instagram data from the **Target Account.**

47.    On January 8, 2025, the Honorable Karen S. Crawford signed a warrant to search the Instagram account "sammy_xoxo11" that was otherwise identical to this warrant application. Given the typographical error in the Instagram account name, this new warrant is now being submitted for the **Target Account**.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

48.    Based on my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, if the subject receives advance warning of the execution of this warrant, there will be a genuine risk of destruction of evidence.

//

//

//

//

## CONCLUSION

49.     Based on the foregoing, I submit that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I), Alien Smuggling, and that the foregoing will be found on the **Target Account** to be searched, as identified in Attachment A.  I declare under penalty of perjury that the foregoing is true and correct.

*Georgina Hayslip*
_____
Georgina Hayslip
Border Patrol Agent-Intelligence, USBP

Sworn to and subscribed before me this   16   day of January 2025.

_____
HONORABLE MITCHELL D. DEMBIN
United States Magistrate Judge

*Affidavit in Support Search Warrant*

15